Clark, Judge.
Two procedural problems under our Juvenile Court Code are presented for decision in this appeal by a fourteen-year-old boy from a ruling of delinquency in addition to those enumerations of error which attack the court’s finding of delinquency.[1]
*235 The first assignment of error requires us to decide if the sequestration rule of Code § 38-1703 which makes mandatory upon motion the removal of witnesses from the courtroom applies to the juvenile’s parents. This sequesterment situation does not apply to parties. "The rule in reference to the sequestration of witnesses does not apply to a witness who is a party to the case, even though there may be several parties on the same side who are all to be examined as witnesses.” Georgia R. & Bkg. Co. v. Tice, 124 Ga. 459, 460 (3) (52 SE 916).
A reading of the Juvenile Court Code indicates that in those proceedings the parents come within the category of "parties.” This is demonstrated in that the names and residence addresses of the parents must be stated in the petition alleging delinquency (§ 24A-1603 (c)) and in the requirement of § 24A-1701 (a) that "The court shall direct the issuance of a summons to the parents, guardian, or other custodian, a guardian ad litem, and any other persons as appear to the court to be proper or necessary parties to the proceeding. . .” (Emphasis supplied.) Similarly, in § 24A-1701 (e) the word "party” is used in referring to waiver of summons with clear reference to parents or adults in loco parentis.
Under the prior Juvenile Court Act of 1951, our court in Land v. State, 101 Ga. App. 448 (114 SE2d 165) recognized the right of the parents to remain in the courtroom. Appellee’s counsel argues Land should be distinguished in that there the juvenile was also excluded along with the parents whereas here the child and his father were permitted to remain in the courtroom. This argument overlooks the cogency of the rhetorical question propounded by Judge (now Chief Justice) Nichols at page 449 in these words: "While . . . the juvenile in some cases may, and should, be excluded from, at least a part of, certain type hearings, the exclusion of the child or the child’s parents from a hearing or any part thereof when the issue being heard is whether, because of the purported acts of the child, such child is in need of correction is manifestly an abuse of discretion, for who would, under any circumstances, have a more direct interest in the case?”
Moreover, § 24A-1801 (c) indicates the legislative *236 plan for the conduct of hearings was for the parents to be present at all times. It provides that "The court may temporarily exclude the child from the hearing except while allegations of his delinquency or unruly conduct are being heard.” It does not make similar provision for exclusion of parents. Obviously, this falls within the application of the maxim, expressio unius est exclusio alterius.
Since this is the first[2] time this question has been presented under our 1971 Juvenile Court Code we deem it proper to add that the whole concept of this salutary legislation is to treat the erring juvenile as a part of and with the help of his family. In the statute’s opening paragraph the purpose is expressed ". . . that each child coming within the jurisdiction of the court shall receive, preferably in his own home, the care, guidance, and control that will conduce to his welfare and the best interests of the State. . .” (Emphasis supplied.) The judge below recognized this aspect as shown by his making available to the parents during the dispositional phase the investigation report prepared by skilled court personnel under the title of "social history.”
In the light of our rulings in the third division hereafter, we do not deem it necessary to consider whether the sequestration of the mother alone should be considered as harmless error in that the youngster, his father, and his attorneys remained in the courtroom during the entire two-day trial.
The other procedural problem deals with the manner in which juvenile courts should conduct the respective "adjudicatory” and "dispositional” hearings. Appellant contended that each of these must be full-blown evidentiary trials even though all aspects of the alleged offense had already been presented at the first or adjudicatory phase. This contention is based upon certain language used in M.E.B. v. State of Ga., 230 Ga. 154 (195 SE2d 891). There the Supreme Court was dealing with the constitutionality of § 24A-1201 (a) which provides that *237 after a proceeding is commenced in a county other than the child’s residence that the dispositional hearing shall be transferred to the county of the child’s residence. In doing so the court stated that "The adjudication proceeding is actually nothing more than a pre-trial hearing held in the county where the child was apprehended” and compared it to "an arraignment under the Criminal Code.” It is clear that this language must be limited to juvenile proceedings which take place in two counties. It would not apply to trials in one county where the same judge conducts both phases of the bifurcated procedure.
The Juvenile Court Code requires separate trials with each having a different goal. The first or adjudicatory process in a delinquency case is a full scale fact-finding hearing to determine if the child committed the act with which he is charged and whether that constitutes delinquency. This portion is described by Georgia Professor Samuel M. Davis in his book, "The Rights of Juveniles: The Juvenile Justice System,” as being "the functional equivalent of the trial in the regular criminal or civil process.” P. 124. At p. 150 Professor Davis writes: "The principal concern for separating the adjudicatory and dispositional processes arises out of the fact that different evidentiary rules are applicable in the two phases of the court’s consideration... [Virtually any evidence that is material and relevant on the issue of disposition is admissible, because for purposes of making an appropriate disposition, the court needs to know as much about the child as possible. The same is not at all true of the adjudicatory phase, however, since it is comparable to the trial phase of a criminal prosecution. In the adjudicatory hearing, rules of evidence generally prevail.”
In the case at bar the judge had conducted a full-fledged trial during the adjudicatory phase. The transcript of that phase covers 307 pages out of a total of 352 pages. Obviously, the General Assembly’s plan for a bifurcated procedure did not necessitate another complete trial with a reiteration of the same evidence before the same judge. In dividing juvenile trials into two phases our lawmakers intended to give the juvenile judge an *238 opportunity to conduct the "functional equivalent”, of a regular trial (the adjudicatory hearing) in a manner which would satisfy the constitutional procedures required under the Gault case concomitant with the usual legal rules, such as those dealing with admissibility of evidence, proof beyond a reasonable doubt, and similar requirements applicable to adults. Thereafter, at the dispositional phase, the judge was to explore all available additional avenues, including psychiatric and sociological studies, which would enable him to provide a solution for the youngster and his family aimed at making the child a secure law-abiding member of society. Of course, the juvenile must be given during the dis-positional phase all of those rights granted in Chapter 24A-20 of the Juvenile Court Code.
Accordingly, we hold the capable experienced judge here did not err in refusing to have the dispositional phase include a repetition of the same evidence and witnesses previously presented to him during the adjudicatory portion.
We next consider those enumerations which are limited to events which occurred during the adjudicatory phase.
The proceeding was instituted by the requisite formal petition which alleged the child to be "delinquent” and "in need of treatment and/or rehabilitation” by reason of having committed the offense of arson in the first degree in violation of Criminal Code § 26-1401 by illegal entry into the Sagamore Hills Elementary School and causing a fire which destroyed the library and did extensive damage to the building. Subsequently this petition was amended in its entirety by the substitution of another complaint charging the offense of arson in the second degree. The trial therefore was on the basis of Criminal Code § 26-1402, which requires the state to prove that the accused "by means of fire or explosive. . . knowingly damages any building or structure of another without his consent.” At the conclusion of the adjudicatory hearing the judge ruled that the juvenile had committed neither arson in the first degree as originally charged nor arson in the second degree as presented in the amended petition. His ruling of *239 delinquency was based upon the lesser offense of criminal damage in the second degree and specifically upon that portion of Criminal Code § 26-1502 which defines the crime to be one in which the offender "recklessly, or intentionally by means of fire or explosive, damages property of another person.”
The only evidence connecting the appellant with the incendiary event were statements made by him to other youngsters. Five teen-agers testified concerning these statements which were made on three different occasions. The first was while the fire department was fighting the blaze. At that time he came from his nearby residence to a group and as testified by one of those who heard him, the appellant said, "he climbed in through the window and his foot hit an electrical switch and the rug caught on fire and so he climbed back out.” (T. 153). Another repeated his remarks to have been that "He said he was climbing, he was gonna go in the window and his foot kicked a cord and it started sparking and it hit his leg and so he climbed out . . .” (T. 60). Another witness stated that on another occasion the appellant "whispered to me and about two other people that not to tell anybody but he started the fire by an accident.” (T. 169). The testimony of a youngster in another group was that during the fire "He just said that he had started the fire, accidentally... He said he kicked a fuse box, or some, [sic] he said he kicked something and it sparked.” (T. 170).
The juvenile admitted making statements of this nature but specifically denied having actually committed the offense. He explained these statements to have been boyish braggadocio. He mentioned that the first instance stemmed in part from intending to put himself in the same class as one of his listeners who had been in trouble for vandalizing the school. In addition to his express denials of the offense, the accused presented alibi testimony showing him to be elsewhere when the fire had its inception. Additionally, it was clearly established that he was not the perpetrator of a minor fire involving a science exhibit earlier in the afternoon in the cafeteria-auditorium. Each of the teen-age witnesses who testified as to appellant’s incriminating admissions acknowledged that they did not believe appellant to have *240 performed as he had boasted.
We do not pass upon the question of credibility since this is the function of the court below. Our assignment is to determine if the record and transcript is sufficient to meet requisite legal standards so as to show appellant violated Code § 26-1502 (b), that statute being the basis of the court’s finding of delinquency.
Although the crime of criminal damage in the second degree is located in the Code Chapter entitled "Criminal Damage to Property” and immediately follows the chapter on "Arson and Related Offenses,” the judge below correctly decided that the words used in Code § 26-1502 (b), to wit, "recklessly, or intentionally, by means of fire or explosive, damages property of another,” constituted a lesser offense within the ambit of § 26-1402 ("Arson in the second degree”) with which the juvenile was charged. This is in conformance with Code § 26-505 (b) in that "It differs from the crime charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest, or a lesser kind of culpability suffices to establish its commission.” Accordingly, the decision of this court in Sims v. State, 12 Ga. App. 551 (77 SE 891) and the cases cited therein apply. There, at page 552, Judge Pottle,[3] in his simple lucid style wrote: "In an arson case the corpus delicti consists of the burning of the house by some criminal agency. [Cit.] There was proof of a confession, but it is well settled that the corpus delicti must be proved aliunde the confession. [Cits.] The presumption is that the burning was the result of either accident or some providential cause, rather than some criminal design. . .”
The evidence in this case fails to meet this legal litmus test. The fire department witnesses were unable to *241 show how or where the conflagration originated. Captain Brackett’s testimony on this was as follows: "Q. Okay. Can you say to a certainty where the fire started? A. No sir. I can’t pen [pin?] point a definite place.” (T. 113). After stating he suspected arson, Inspector Foster said, "Well, you had the [earlier] fire in the cafetorium, that fire in there, it was a set fire, suspicious origin. I cannot say that the library was a case of arson because everything that was in there was destroyed. The only thing I can say that was set was the fire in the cafetorium on the stage [of the science exhibit].” At pages 140 and 141 the witness testified as an expert he could not say where the fire originated. Absent the juvenile’s incriminating statements, there is not sufficient evidence to establish that he committed the offense of which he was accused.
Appellee’s able counsel cites from Wilburn v. State, 141 Ga. 510, 514 (81 SE 444) that,"... in order to prove the corpus delicti, there must be evidence showing it independently of the confession; but it does not follow that the confession can not be considered in connection with such independent or aliunde evidence in passing on the question as to whether the corpus delicti has been proved.” The defect in this contention is that the allegedly incriminating statements are not such as to fit within the statutory definition of the crime. The words, "recklessly, or intentionally, by means of fire or explosive, damages property of another” (emphasis supplied), applies to acts categorized in the vernacular as "playing with fire” where an inflammable instrumentality controlled by the malefactor causes the conflagration. Furthermore, at the extreme, the inculpatory admissions would establish a trespass (which is not the accusation here) that resulted in a fire accidentally. In the words of Code § 26-602, a crime cannot be committed "by misfortune or accident.”

Judgment reversed.

Pannell, P. J., and Quillian, J., concur.

Because juvenile court trials are not criminal trials the terms "guilty” and "acquittal” are not used.

In K. E. S. v. State of Ga., 134 Ga. App. 843 we dealt with a situation in which the parent was an adversary party.

James Robert Pottle (1875-1933) had been a partner in Blakely with the famed Arthur G. Powell when the latter was elected as one of the first three judges of our court. Upon Judge Powell’s resignation from this bench, Judge Pottle was named his successor. He served two years, resigning to return to practice in an Albany partnership. His memorial appears in 48 Ga. App. 857.